Slip Op. 15-14

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____ :
                                    :
BEIJING TIANHAI INDUSTRY CO.,       :
LTD.,                               :
                                    :
            Plaintiff,              :
                                    :
            v.                      :
                                    :      Before: Richard K. Eaton, Senior Judge
UNITED STATES,                      :
                                    :      Court No. 12-00204
            Defendant,              :
                                    :
            and                     :
                                    :      PUBLIC VERSION
NORRIS CYLINDER COMPANY,            :
                                    :
            Defendant-Intervenor.   :
_____ :
```

## OPINION

[Plaintiff's motion for judgment on the agency record is denied and the Department of Commerce's final determination is sustained.]

Dated: February 6, 2015

*Mark E. Pardo* and *Andrew T. Schutz*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., argued for plaintiff.   With them on the brief was *Francis J. Sailer*.

*Douglas G. Edelschick*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant.   With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.   Of counsel on the brief was *Matthew D. Walden*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

*Edward M. Lebow* and *Nora L. Whitehead*, Haynes and Boone, LLP, of Washington, D.C., argued for defendant-intervenor.

EATON, Senior Judge: This subsidy case is before the court on Beijing Tianhai

Industry Co., Ltd.'s ("BTIC" or "plaintiff") motion for judgment on the agency record challenging

the final determination of the United States Department of Commerce ("Commerce" or the

"Department") in *High Pressure Steel Cylinders From the People's Republic of China*, 77 Fed.

Reg. 26,738 (Dep't of Commerce May 7, 2012) (final affirmative countervailing duty

determination), and accompanying Issues and Decision Memorandum ("Issues & Dec. Mem.")

(collectively, "Final Determination"), and the subsequent countervailing duty order published as

*High Pressure Steel Cylinders From the People's Republic of China*, 77 Fed. Reg. 37,384 (Dep't

of Commerce June 21, 2012) (countervailing duty order).   For the reasons set forth below,

Commerce's Final Determination is sustained.


## BACKGROUND

In June 2011, in response to a petition filed by defendant-intervenor Norris Cylinder

Company ("defendant-intervenor"), the Department initiated a countervailing duty investigation

of high pressure steel cylinders from the People's Republic of China ("PRC").   High Pressure

Steel Cylinders From the PRC, 76 Fed. Reg. 33,239 (Dep't of Commerce June 8, 2011) (initiation

of countervailing duty investigation) ("Initiation Notice").   Commerce selected BTIC, together

with its cross-owned[1] affiliates, which included Tianjin Tianhai High Pressure Container Co., Ltd.

("Tianjin Tianhai"), as the mandatory respondent.   Issues & Dec. Mem. at I.   The period of

investigation ("POI") was January 1, 2010 through December 31, 2010.   Issues & Dec. Mem. at

II.A.   The Department investigated whether BTIC and Tianjin Tianhai received countervailable

---

[1]        "Cross-ownership exists between two or more corporations where one corporation
can use or direct the individual assets of the other corporation(s) in essentially the same ways it can
use its own assets."   19 C.F.R. § 351.525(b)(6)(vi).

subsidies[2] by obtaining seamless tube steel ("steel tube"), an input in the manufacture of the

valves, for less than adequate remuneration.   *See* Initiation Notice, 76 Fed. Reg. at 33,241.   As

part of its investigation, the Department issued questionnaires to determine if the steel tube inputs

purchased by BTIC and Tianjin Tianhai from third-party trading companies—steel tube that those

third-party trading companies had purchased from the producers—were provided by

"authorities,"[3] as that term is used in 19 U.S.C. § 1677(5)(B), and whether a "benefit"[4] was

provided to BTIC and Tianjin Tianhai, as that term is used in 19 U.S.C. § 1677(5)(E)(iv) and 19

C.F.R. § 351.511.[5]

        BTIC answered the questionnaires for itself and Tianjin Tianhai, describing their supply

chain and indicating that one producer whose steel tube is at issue[6] was a non-cross-owned

---

[2]        Under 19 U.S.C. § 1677(5)(B)(i), a "subsidy" is provided where "an authority . . . provides a financial contribution."

[3]        The statute defines an "authority" as "a government of a country or any public entity within the territory of the country."   19 U.S.C. § 1677(5)(B).

[4]        The statute directs that
        [a] benefit shall normally be treated as conferred where there is a benefit to the recipient, including—
        . . . .
                (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration . . . .
        For purposes of clause (iv), the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.   Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.
19 U.S.C. § 1677(5)(E).

[5]        Commerce's regulation states that, "[i]n the case where goods or services are provided, a benefit exists to the extent that such goods or services are provided for less than adequate remuneration."   19 C.F.R. § 351.511(a)(1).

[6]        [[                                                                                    ]].

affiliate of BTIC (the "Affiliated Producer").[7]   The government of the PRC (the "PRC

government") provided the Department with ownership information for another steel tube

producer (the "Unaffiliated Producer"), with which BTIC had no affiliate relationship.[8]

On October 18, 2011, the Department issued a Preliminary Determination, in which it

found that the Affiliated Producer and the Unaffiliated Producer were both authorities under 19

U.S.C. § 1677(5)(B), providing financial contributions pursuant to 19 U.S.C. § 1677(5)(D)(iii),

and that BTIC and Tianjin Tianhai received a benefit as described in 19 U.S.C. § 1677(5)(E)(iv).

*See* High Pressure Steel Cylinders From the PRC, 76 Fed. Reg. 64,301, 64,305 (Dep't of

Commerce Oct. 18, 2011) (preliminary affirmative countervailing duty determination and

alignment of final countervailing duty determination with final antidumping duty determination)

("Preliminary Determination").   As a result, the Department preliminarily determined that the

transactions through the third-party trading companies were countervailable transactions because

the steel tube was provided by producers, which were authorities, and that a benefit was conferred

on BTIC to the extent that a good (the steel tube) was provided for less than adequate

remuneration.   Preliminary Determination, 76 Fed. Reg. at 64,305.

To measure the adequacy of remuneration, Commerce sought to construct a benchmark

price,[9] representative of the market price for steel tube, in accordance with 19 C.F.R. §

---

[7]        BTIC reported that Tianjin Tianhai, its cross-owned affiliate, had a minority
shareholder that was [[                          ]] by [[          ]] (the Affiliated Producer).  *See* Letter
from Francis J. Sailer, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, Counsel for
BTIC, to Hon. Rebecca M. Blank, Acting Secretary of Commerce, Import Administration, U.S.
Department of Commerce at 4, CD 19 at bar code 3027967-01 (Sept. 2, 2011), ECF Dkt. No. 18.

[8]        [[                                                            ]].

[9]        The benchmark price is "the price that could have constituted adequate
remuneration."   *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir.
(footnote continued)

351.511(a)(2).   Commerce's hierarchy, contained in its regulation, directs it to "normally" rely on

"a market-determined price for the good or service resulting from actual transactions in the

country in question."   19 C.F.R. § 351.511(a)(2)(i); *see also* Countervailing Duties, 63 Fed. Reg.

65,348, 65,377 (Dep't of Commerce Nov. 25, 1998).   Where "there is no useable

market-determined price with which to make the comparison," however, the regulation directs the

Department "to measure the adequacy of remuneration by comparing the government price to a

world market price where it is reasonable to conclude that such price would be available to

purchasers in the country in question."   19 C.F.R. § 351.511(a)(2)(ii).

Using ownership information provided by the PRC government, the Department found that

38 percent of steel tube production in the PRC during the POI was manufactured by companies

that had been designated by Commerce as state-owned.   Preliminary Determination, 76 Fed. Reg.

at 64,305.   Finding that this level of government ownership was substantial, the Department

determined preliminarily "that domestic prices in the PRC for [steel tube were] distorted such that

they [could not] be used as a tier one benchmark."   Preliminary Determination, 76 Fed. Reg. at

---

2014).   The Department compares the respondent's reported costs for the input in question (e.g.,
steel tube) with the calculated benchmark price, which is representative of the market price for the
good at issue.   *See id.* at 1368, 1370.
     "[T]he bases for identifying an appropriate market-based benchmark for measuring the
adequacy of the remuneration of a government provided good or service" are set forth in 19 C.F.R.
§ 351.511(a)(2).   Preliminary Determination, 76 Fed. Reg. at 64,304; *see also Essar Steel Ltd. v.
United States*, 34 CIT __, __, 721 F. Supp. 2d 1285, 1292 (2010).   These potential benchmarks are
listed by the Department in order of preference:
> (1) Market prices from actual transactions within the country under investigation
> for the government-provided good (e.g., actual sales, actual imports, or
> competitively run government auctions) ("tier one" benchmarks); (2) world market
> prices that would be available to purchasers in the country under investigation
> ("tier two" benchmarks); or (3) prices consistent with market principles based on
> an assessment by the Department of the government-set price ("tier three"
> benchmarks).

Preliminary Determination, 76 Fed. Reg. at 64,304 (citing 19 C.F.R. §  351.511(a)(2)).

64,305.   Having found domestic prices in the PRC for steel tube to be unusable, the Department

instead used world market prices available to purchasers in the PRC (i.e., a tier-two benchmark) as

a benchmark for steel tube.   *See* Preliminary Determination, 76 Fed. Reg. at 64,305.   Thus,

Commerce preliminarily relied on free on board ("FOB")[10] and export prices submitted by

defendant-intervenor, which were reported in *SteelOrbis*[11] for exports from Italy, when

determining the value of the steel tube provided.   Preliminary Determination, 76 Fed. Reg. at

64,305.   It then added delivery charges to the benchmark price, which included, among other

things, inland freight charges.   *See* Preliminary Determination, 76 Fed. Reg. at 64,305.

Commerce also added the value of the import duties reported by the PRC government and the

value-added tax ("VAT")[12] applicable to imports of steel tube into the PRC.   Preliminary

Determination, 76 Fed. Reg. at 64,305.

Following the Preliminary Determination, in its case brief before Commerce, plaintiff

argued that the transactions involving the third-party trading companies could not be countervailed

---

[10]      FOB (free on board) is a standardized shipping term "mean[ing] that the seller
delivers the goods on board the vessel nominated by the buyer at the named port of shipment or
procures the goods already so delivered.   The risk of loss of or damage to the goods passes when
the goods are on board the vessel, and the buyer bears all costs from that moment onwards."
*Cutter & Buck, Inc. v. United States*, 37 CIT __, __ n.1, Slip Op. 13-45, at 2 n.1 (2013) (citations
omitted) (internal quotation marks omitted).

[11]      "SteelOrbis is a[n] . . . e-marketplace and market intelligence provider that offers
up-to-date news on the steel industry and steel trading from one single source."   *About Us*,
STEELORBIS, https://www.steelorbis.com/support/about-us.htm (last visited Dec. 18, 2014).
*SteelOrbis* provides "steel prices [that] are spot prices garnered from real market transactions."
*Frequently Asked Questions*, STEELORBIS,
https://www.steelorbis.com/support/frequently-asked-questions.htm#11 (last visited Dec. 18,
2014).

[12]      The VAT, or the value-added tax, is "[a] tax on the estimated market value added to
a producer or material at each stage of its manufacture or distribution, ultimately passed on to the
consumer."   AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1900 (4th ed. 2000).
The tax is normally a percentage of the estimated market value added.

because (1) the Affiliated Producer was an affiliate of BTIC and Tianjin Tianhai, and (2) the

Unaffiliated Producer was not an authority.   *See* BTIC Group's Administrative Case Br. at 16, 23,

CD 92 at bar code 3065133-01 (Mar. 23, 2012), ECF Dkt. No. 18 ("BTIC's Case Br.").

Plaintiff also submitted additional proposed benchmark information in the form of

*SteelOrbis* prices of steel tube from Ukraine and Iran.   When submitting these prices, plaintiff

argued that the value of the benefit, if in fact there was any, should have been calculated using the

Ukrainian price data it supplied, because those prices were more specific to the size of steel tube

that BTIC and Tianjin Tianhai used.   *See* BTIC's Case Br. at 35–37.   Alternatively, plaintiff

proposed that, in the event that Commerce did not use the Ukraine data, it should instead use the

lowest world market price during each month.   BTIC's Case Br. at 38.   As a third option,

plaintiff suggested that the Department average all of the prices on the record to obtain a world

market benchmark price.   *See* BTIC's Case Br. at 41.

In addition, plaintiff contended that Commerce should not have added the VAT and import

duties.   BTIC's Case Br. at 41–42.   According to plaintiff, neither BTIC nor Tianjin Tianhai was

required to pay the VAT or import duties on imported steel tube used for export.   *See* BTIC's

Case Br. at 41.

In its Final Determination, the Department made one departure from the Preliminary

Determination.   Rather than rely on the Italian prices as the world market price, as it had done in

its Preliminary Determination, Commerce accepted plaintiff's suggestion and averaged the prices

available on the record (from Ukraine, Italy, and Iran) to calculate the benchmark price.   *See*

Issues & Dec. Mem. at cmt. 8.   This action followed.

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."   19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.  LEGAL FRAMEWORK

Under the trade statute, a countervailable subsidy is found to be present where "an authority . . . provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B)(i).   The Department, however, is directed to determine "whether a subsidy exists . . . without regard to whether the subsidy is provided directly or indirectly on the manufacture, production, or export of merchandise."   *Id.* § 1677(5)(C).   When determining the amount of any subsidy under tier two, "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review.   Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale."   *Id.* § 1677(5)(E).

### II.  THE DEPARTMENT'S DETERMINATION TO COUNTERVAIL BTIC'S PURCHASES OF STEEL TUBE

#### A.  The Department Reasonably Determined that the Unaffiliated Producer Was an "Authority"

In the Final Determination, the Department determined that the Unaffiliated Producer was an authority, for purposes of 19 U.S.C. § 1677(5)(B), because it was majority-owned by the PRC

government.[13]   Mem. from Christian Marsh, Deputy Assistant Secretary for Antidumping and

Countervailing Duty Operations, for Ronald K. Lorentzen, Acting Assistant Secretary for Import

Administration at 1–2, CD 95 at bar code 3073403-01 (Apr. 30, 2012), ECF Dkt. No. 18

("Unaffiliated Producer Mem.").   This conclusion was based on a capital verification report

supplied by the PRC government, which showed that the Unaffiliated Producer was more than

fifty-percent-owned by companies that were, in turn, owned by the PRC government.   *See*

Unaffiliated Producer Mem. at 1–2.   In addition, however, the PRC government also supplied the

Department with the Unaffiliated Producer's articles of association.   *See* Letter from Francis J.

Sailer, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, Counsel for BTIC, to Hon.

Rebecca M. Blank, Acting Secretary of Commerce, Import Administration, U.S. Department of

Commerce at 42–43, Ex. 22, CD 26 at bar code 3028411-01 (Sept. 7, 2011), ECF Dkt. No. 18

("Articles of Association").   Unlike the capital verification report, information in the articles of

association indicated that the Unaffiliated Producer would become less than fifty-percent-owned

by companies held by the PRC government at a future time beyond the date of the capital

verification report.   *See* Articles of Association at 42–43, Ex. 22.   The Department chose to rely

---

[13]       The Department adhered to its practice, found in accordance with law by this Court, to treat an input producer, that is found to be majority-owned by the PRC government, as an authority within the meaning of 19 U.S.C. § 1677(5)(B).   *See* Issues & Dec. Mem. at V.E. (citing Certain New Pneumatic Off-the-Road Tires From the PRC, 73 Fed. Reg. 40,480 (Dep't of Commerce July 15, 2008) (final affirmative countervailing duty determination and final negative determination of critical circumstances), and accompanying Issues and Decision Memorandum at IV.A.1).   Indeed, this Court in *Guangdong Wireking Housewares & Hardware Co. v. United States* found that Commerce's treatment of input suppliers as authorities, within the meaning of the statute, based solely on the PRC government's majority-ownership interest in those suppliers, to be reasonable.   *Guangdong Wireking Housewares & Hardware Co. v. United States*, 37 CIT __, __, 900 F. Supp. 2d 1362, 1377 (2013), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014).   The *Guangdong* Court found that the term "public entity" was undefined by the statute and Commerce's regulations, but held that Commerce's construction of the term, under step two of *Chevron* was reasonable.   *See id.*; *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984).

on the capital verification report because, as it was dated eight days later than the articles of association, it was the ownership information on the record most contemporaneous to the POI. *See* Unaffiliated Producer Mem. at 3.

Plaintiff contends that the Department should not have relied upon the ownership percentages found in the capital verification report.   Br. in Supp. of Pl.'s Rule 56.2 Mot. for J. upon the Agency R. 25–27 (ECF Dkt. No. 31) ("Pl.'s Br.").   Rather, it insists that Commerce should have used the percentages in the articles of association.   Pl.'s Br. 25–27.   According to plaintiff, given the close timing of the articles of association and the capital verification report, such a non-capital-affecting share transfer must have occurred.   *See* Pl.'s Br. 26–27.   That is, for plaintiff, the ownership percentages in the company's articles of association reflected the company's "current" (most contemporaneous to the POI) ownership, and thus, the Unaffiliated Producer was not majority-owned by the PRC government.   *See* Pl.'s Br. 26 ("[I]n addition to the [PRC government] indicating that capital verification reports, *in general*, are not required for share transfers that do not involve a change in capital, the articles of association here dated a few days prior to the capital verification report *specifically* indicate that just such a share transfer occurred. The only reasonable conclusion from this fact is that the articles of association reflect the company's current ownership.").

Plaintiff also argues that the capital verification report is actually less contemporaneous with the POI than the articles of association.   *See* Pl.'s Br. 27.   Thus, it maintains that, although the capital verification report post-dates the articles of association, the articles of association make reference to anticipated future changes in ownership, including reference to an anticipated capital increase after the date of the capital verification report.   Pl.'s Br. 27 (citing Letter from Francis J. Sailer, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, Counsel for BTIC, to Hon.

Rebecca M. Blank, Acting Secretary of Commerce, Import Administration, U.S. Department of

Commerce at 527, CD 27 at bar code 3028411-02 (Sept. 7, 2011), ECF Dkt. No. 18) ("The

reference to a future date beyond the 'amended' date[,] . . . which is *after* the date of the capital

verification report further indicates that the articles of association are more contemporaneous than

the capital verification.").   For plaintiff, the Department's determination that the Unaffiliated

Producer was majority-owned by the PRC government is unsupported by substantial evidence.

Pl.'s Br. 24.

      Here, the Department's determination to rely upon the capital verification report was

supported by substantial evidence.   Because the capital verification report is dated after the

articles of association, substantial evidence supports the Department's finding that the capital

verification report was the most contemporaneous information to the POI on the record.[14]

Commerce's decision to give controlling weight to the ownership percentages in the capital

verification report was thus reasonable.   Although the articles of association contained language

indicating that it anticipated events would occur after its date of preparation, there is no record

evidence that any change in ownership percentages actually took place.   Further, in its initial

questionnaire response, plaintiff explicitly identified the Unaffiliated Producer as an "SOE," i.e., a

state-owned enterprise.   *See* Letter from Francis J. Sailer, Grunfeld, Desiderio, Lebowitz,

Silverman & Klestadt LLP, Counsel for BTIC, to Hon. Rebecca M. Blank, Acting Secretary of

Commerce, Import Administration, U.S. Department of Commerce at 531, CD 24 at bar code

3027967-06 (Sept. 2, 2011), ECF Dkt. No. 18.   Accordingly, it cannot be said that Commerce's

---

[14]     The capital verification report for the Unaffiliated Producer was marked as for the
period "[[                                        ]]."   Unaffiliated Producer Mem. at 3.   The articles of
association, however, are marked "[[                                                   ]]."   Unaffiliated Producer
Mem. at 3.

choice to rely upon the capital verification report was unsupported by substantial evidence.

Therefore, Commerce's determination that the Unaffiliated Producer was majority-owned by the

PRC government, and thus an authority, in accordance with 19 U.S.C. § 1677(5)(B), is sustained.

### B.  The Department's Determination to Countervail BTIC's Purchases of Steel Tube Was Supported by Substantial Evidence and in Accordance with Law

In the Final Determination, Commerce found that BTIC and Tianjin Tianhai received

countervailable subsidies through their purchases of steel tube produced by the Affiliated

Producer[15] (a company found by the Department to be an authority[16]), which the Affiliated

Producer sold to third-party trading companies.   *See* Issues & Dec. Mem. at cmt. 7.   The

third-party trading companies then resold the steel tube to BTIC and Tianjin Tianhai at, what the

Department concluded, was a below-market price.   *See* Issues & Dec. Mem. at V.F., cmt. 7.

The Department used the sales prices from the trading companies to determine the value of

the benefit provided to BTIC and Tianjin Tianhai in its less-than-adequate-remuneration

calculation.   *See* Issues & Dec. Mem. at cmt. 7.   In other words, Commerce found a

countervailable subsidy even though BTIC and Tianjin Tianhai purchased the steel tube from the

unaffiliated, third-party trading companies, and not directly from the Affiliated Producer.   The

Department also determined that any effect on the price that might have resulted from the

affiliation between the input producer (i.e., the Affiliated Producer) and BTIC (and Tianjin

Tianhai) was not relevant.   *See* Issues & Dec. Mem. at cmt. 6.   This was because it measured the

---

[15]      As noted, the Department's subsidy analysis of the steel tube produced and sold by the Unaffiliated Producer was identical to its evaluation of the transaction chain involving the sales of steel tube produced and sold by the Affiliated Producer.

[16]      It is undisputed that the Affiliated Producer is a state-owned entity, and thus an authority pursuant to 19 U.S.C. § 1677(5)(B).   *See* Pl.'s Br. 8.

receipt of the benefit based on the sales made between the unaffiliated, third-party trading companies and BTIC (and Tianjin Tianhai), and not between BTIC (and Tianjin Tianhai) and the affiliated input producer (the Affiliated Producer).   *See* Issues & Dec. Mem. at cmt. 6.

        The court holds that the Department's determination is supported by substantial evidence and is in accordance with law.

        As noted, under the countervailing duty statute, a subsidy is found to be present where "an authority . . . provides a financial contribution . . . to a person and a benefit is thereby conferred. . . . [T]he term 'authority' means a government of a country or any public entity within the territory of the country."   19 U.S.C. § 1677(5)(B).   Here, the Department found that a financial contribution was made by the Affiliated Producer (an authority) to the third-party trading companies and that a benefit was conferred on BTIC and Tianjin Tianhai in the form of paying less than adequate remuneration for the steel tube purchased from the third-party trading company suppliers.   *See* Issues & Dec. Mem. at cmt. 7 ("Consistent with case precedent, we determine that the [PRC government's] financial contribution (provision of a good) is made to the trading company suppliers that purchase steel inputs, while all or some portion of the benefit is conferred on the . . . cross-owned affiliates [(BTIC and Tianjin Tianhai)] through their purchases of steel inputs from the trading company suppliers.   The statute does not require the Department to make a separate finding that the trading companies provided a financial contribution to BTIC." (footnote omitted)).

        Under the Department's construction of the statute, "the two necessary elements of a subsidy—financial contribution and benefit—need not necessarily go to the same person."   Def.'s Resp. to Pl.'s Mot. for J. upon the Agency R. 16 (ECF Dkt. No. 35) ("Def.'s Br.").   Defendant insists that, because the statute is silent as to whether "the 'person' who receives the 'financial

contribution' must be the same as the person who receives the 'benefit,'" Commerce's

construction of the statute must be afforded *Chevron* deference, and be upheld, because its

interpretation is reasonable.   Def.'s Br. 16–17 (citing *United States v. Eurodif S. A.*, 555 U.S. 305,

316 (2009); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)).

    "When reviewing Commerce's construction of the trade statute, this Court is directed by

the two-step framework set forth by *Chevron*."   *Xiping Opeck Food Co. v. United States*, 38 CIT

__, __, Slip Op. 14-142, at 16 (2014) (citing *Fine Furniture (Shanghai) Ltd. v. United States*, 748

F.3d 1365, 1369 (Fed. Cir. 2014)); *see also Chevron*, 467 U.S. at 842–43.   The first step requires

the court to determine whether Congress's intent under the statute is clear.   *Chevron*, 467 U.S. at

842–43.   If Congress's intent is found to be clear, the court "must give effect to the

unambiguously expressed intent of Congress.   If, however, the court determines Congress has not

directly addressed the precise question at issue," that is, "the statute is silent or ambiguous with

respect to the specific issue, the question for the court is whether the agency's answer is based on a

permissible construction of the statute."   *Id.* (footnote omitted).   "Further, under *United States v.*

*Mead*, Commerce's construction of a statute need not be found in a formal regulation adopted after

notice-and-comment to receive deference."   *Xiping*, 38 CIT at __, Slip Op. 14-142, at 17 (citing

*United States v. Mead Corp.*, 533 U.S. 218, 230–31 (2001)).   Its interpretation, however, must be

accompanied by some degree of formality.   *See Mead*, 533 U.S. at 227 ("Delegation of such

authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or

notice-and-comment rulemaking, or by some other indication of a comparable congressional

intent.").   Thus, "administrative implementation of a particular statutory provision qualifies for

*Chevron* deference when it appears that Congress delegated authority to the agency generally to

make rules carrying the force of law, and that the agency interpretation claiming deference was

promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27.

Here, the Affiliated Producer, which Commerce found to be an authority, sold its steel tube

to independent, third-party trading companies.   These companies then subsequently sold the steel

tube to BTIC and Tianjin Tianhai.   The Department found that, under 19 U.S.C. § 1677(5)(B), "a

subsidy is deemed to exist when there is a financial contribution 'to a person' and a 'benefit is

thereby conferred.'"   Issues & Dec. Mem. at cmt. 7.   Commerce determined further, that "the

question of whether a subsidy is conferred hinges on whether the producer of the input—not the

trading company—is an 'authority.'"   Issues & Dec. Mem. at cmt. 7.   Based on its past practice,

the Department "determine[d] that the [PRC government's] financial contribution (provision of a

good) [was] made to the trading company suppliers that purchase[d] steel inputs, while all or some

portion of the benefit is conferred on . . . BTIC and its cross-owned affiliates [(i.e., Tianjin

Tianhai)] through their purchases of steel inputs from the trading company suppliers."   Issues &

Dec. Mem. at cmt. 7.   The Department reasoned that "[t]he statute d[id] not require [it] to make a

separate finding that the trading companies provided a financial contribution to BTIC."   Issues &

Dec. Mem. at cmt. 7.   That is, for Commerce, it was permissible, under the statute, for it to

determine that a financial contribution was made by the Affiliated Producer (the "authority") to the

third-party trading company suppliers (the "persons") and a benefit was conferred upon BTIC and

Tianjin Tianhai by means of their purchases of that steel tube for less than adequate remuneration

from the trading companies.   In other words, according to the Department, it was not necessary

for the person that received the financial contribution to be the same person that received the

benefit under the statute.   The court finds Commerce's interpretation of the statute found in the

Issues and Decision Memorandum, that the person who receives the financial contribution need

not be the same person who receives the benefit, to be a permissible construction of the statute.

As an initial matter, based on the plain language of the statute, Congress's intent is unclear

as to whether the benefit must be received by the same person that received the financial

contribution in order for a subsidy to be present.   Thus, the court must determine, under step two

of *Chevron*, whether Commerce's construction of the statute—that the benefit need not be

conferred upon the same person that receives the financial contribution—is reasonable.   *See*

*Chevron*, 467 U.S. at 843.

First, it is apparent that the unfair trade statute permits Commerce to countervail the

transactions at issue here.   The statute states that, if the Department "determines that the

government of a country or any public entity within the territory of a country is providing, *directly*

*or indirectly*, a countervailable subsidy with respect to the manufacture, production, or export of a

class or kind of merchandise imported . . . into the United States" and the International Trade

Commission determines that those imports "materially injure" or threaten a United States industry

with material injury, "then there shall be imposed upon such merchandise a countervailing duty, in

addition to any other duty imposed, equal to the amount of the net countervailable subsidy."   19

U.S.C. § 1671(a) (emphasis added).

The statute defines a countervailable subsidy as "the case in which an authority . . .

provides a financial contribution . . . to a person and a benefit is thereby conferred."   19 U.S.C. §

1677(5)(B).   The Statement of Administrative Action[17] accompanying the Uruguay Round

---

[17]      The Statement of Administrative Action is "an authoritative expression by the
United States concerning the interpretation and application of the Uruguay Round Agreements and
this Act in any judicial proceeding in which a question arises concerning such interpretation or
application."   19 U.S.C. § 3512(d).

Agreements Act, which resulted in Congress passing 19 U.S.C. § 1677(5)(B), clarifies that

Congress intended "the term 'person' to identify the commercial entity, such as a firm or industry,

to which the government or public body provides a financial contribution."   Uruguay Round

Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, at 925 (1994),

*reprinted in* 1994 U.S.C.C.A.N. 4040, 4239 ("SAA").

 Moreover, the statute anticipates that the financial contribution need not be direct.

Legislative history demonstrates that Congress understood that the Department intended to

prevent the circumvention of the statute through the conferral of indirect subsidies.   *See* SAA,

H.R. Doc. No. 103-316, at 926, *reprinted in* 1994 U.S.C.C.A.N. at 4239–40 ("The Administration

plans to continue its policy of not permitting the indirect provision of a subsidy to become a

loophole when unfairly traded imports enter the United States and injure a U.S. industry. . . . In

cases where the government acts through a private party, . . . the Administration intends that the

law continue to be administered on a case-by-case basis . . . . It is the Administration's view that

Article 1.1(a)(1)(iv) of the Subsidies Agreement and [19 U.S.C. § 1677(5)(B)(iii)] encompass

indirect subsidy practices like those which Commerce has countervailed in the past, and that these

types of indirect subsidies will continue to be countervailable, provided that Commerce is satisfied

that the standard under [19 U.S.C. § 1677(5)(B)(iii)] has been met."); *see also* Countervailing

Duties, 63 Fed. Reg. at 65,361 ("When we examine indirect subsidies, we are inquiring into

whether a government is entrusting or directing a private entity to provide a reduced-cost input or

enhanced revenue to a firm that produces the subject merchandise.").   In other words, Congress

knew, when enacting the statute, that whether a subsidy is provided directly or indirectly would be

irrelevant to the law's implementation.   *See* 19 U.S.C. § 1677(5)(C) ("The determination of

whether a subsidy exists shall be made without regard to whether the recipient of the subsidy is

publicly or privately owned and without regard to whether the subsidy is provided directly or

indirectly on the manufacture, production, or export of merchandise.").

Case law, moreover, not only permits the countervailing of the transactions at issue, but has

found lawful the methodology Commerce has employed here.   This Court, in *Guangdong*

*Wireking Housewares & Hardware Co. v. United States*, upheld Commerce's determination, in

which it found purchases of wire rod from privately-owned trading companies that had been

produced by state-owned producers (authorities), to be countervailable.   *Guangdong Wireking*

*Housewares & Hardware Co. v. United States*, 37 CIT __, __, 900 F. Supp. 2d 1362, 1379–80

(2013), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014).   The *Guangdong* Court explained that Commerce's

finding that the respondent "received the benefits of an indirect financial contribution, enabling it

to purchase wire rod below the benchmark price," was in accordance with 19 U.S.C. § 1677(5),

and, in addition, that "Commerce was not required to undergo an upstream subsidies analysis or

determine that the trading companies in question were 'authorities.'"   *Id.* at __, 900 F. Supp. 2d at

1380.   The *Guangdong* facts are virtually identical to the facts here.

Further, Commerce's determination and the *Guangdong* Court's holding are consistent

with the Federal Circuit's opinion in *Delverde, SRL v. United States*, in which a privately-owned

producer that had received subsidies from the Italian government, sold assets to another

privately-owned producer.   *See Delverde, SRL v. United States*, 202 F.3d 1360, 1362 (Fed. Cir.

2000).   There, the Department assumed that a pro rata portion of the subsidy received by the seller

"passed through" to the purchaser at the time of the sale.   *Id.* at 1363.   The Federal Circuit,

however, found Commerce's methodology for determining whether a company received a

countervailing subsidy to be inconsistent with 19 U.S.C. § 1677(5).   *Id.* at 1370.   The Court held

that the statute did "not allow Commerce to presume conclusively that the subsidies granted to the

former owner of [the] corporate assets automatically 'passed through' to [the purchaser] following

the sale." *Id.* at 1364.   Rather, the Court held that the statute "requires that Commerce make such

a determination by examining the particular facts and circumstances of the sale and determining

whether [the purchaser] directly or indirectly received both a financial contribution and benefit

from a government." *Id.*   Thus, the Court, in *Delverde*, "required Commerce to examine the

circumstances of the transaction to determine whether the countervailable subsidy survived the

transfer." *Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1342 (Fed. Cir. 2004) (citing

*Delverde*, 202 F.3d at 1366).   Indeed, the Federal Circuit has explained that, "in the case of an

indirect subsidy, evidence of a causal nexus between the program and the benefit is also required."

*AK Steel Corp. v. United States*, 192 F.3d 1367, 1372 (Fed. Cir. 1999) (citing *British Steel plc v.*

*United States*, 19 CIT 176, 270, 879 F. Supp. 1254, 1328 (1995)).

Here, the facts supply the "causal nexus" that *Delverde* and *AK Steel* demand.   It is

undisputed that the Affiliated Producer (an authority) sold the steel tube and, as shall be seen,

provided a financial contribution[18] to the trading companies.   It is also apparent that BTIC and

Tianjin Tianhai bought the same steel tube from the third-party trading company suppliers at less

than adequate remuneration.   In the absence of prices for the sale of the steel tube from the

Affiliated Producer to the third-party trading companies, there is no actual evidence of the amount

of the financial contribution, i.e., the size of the below-market discount for the steel tube sold by

the Affiliated Producer to the trading companies.   This lack of evidence, however, is immaterial

to the finding of a subsidy because a subsidy may only be found when a benefit is conferred.   *See*

19 U.S.C. § 1677(5)(B).   Here, the size of the benefit and the fact that it was received are

---

[18]      The statute defines the term "financial contribution" to mean, among other things,
"*providing goods* or services, other than general infrastructure."   19 U.S.C. § 1677(5)(D)(iii)
(emphasis added).

evidenced by the purchases made by BTIC and Tianjin Tianhai of the steel tube at less than adequate remuneration.   Under the facts of this case, therefore, it is evident that there was a nexus between the financial contribution made by the Affiliated Producer, when it sold the steel tube to the trading companies, and the benefit conferred on BTIC and Tianjin Tianhai, when they bought the steel tube for less than adequate remuneration.

That a financial contribution was made by the Affiliated Producer to the trading companies when the steel tube was sold by the Affiliated Producer to the third-party trading companies cannot be doubted.   The trading companies are in the business of making money.   This being the case, the Department could reasonably presume that the trading companies paid no more for the steel tube than the price for which they sold it to BTIC and Tianjin Tianhai.   Thus, the Department was reasonable in finding that the Affiliated Producer made a financial contribution to the trading companies based on the below-world-market sales price for the steel tube paid by BTIC and Tianjin Tianhai to the trading company suppliers.   Therefore, the necessary nexus between the financial contribution and the benefit conferred is demonstrated by (1) the same product being the subject of both sales and (2) BTIC and Tianjin Tianhai paying less than adequate remuneration for the steel tube.   *See AK Steel*, 192 F.3d at 1372 (citing *British Steel*, 19 CIT at 270, 879 F. Supp. at 1328).

Additionally, the sales price between the Affiliated Producer and the third-party trading companies is not relevant to Commerce's determination.   *See* Issues & Dec. Mem. at cmt. 6 ("[R]ecord evidence shows that the transactions for which we are measuring the benefit conferred were not between BTIC and the affiliated producer.").   Pursuant to the statute, the fact that a financial contribution was made, not its size, is all that Commerce must find.   It is the amount of the benefit that must be determined.   Indeed, this is the result demanded by *Delverde* where the

Federal Circuit found that the full amount of a subsidy cannot be presumed to be passed from the

recipient of the subsidy to the purchaser of the subsidized entity's assets.   *See Delverde*, 202 F.3d

at 1364.

As to the size of the benefit, as defendant points out, the benefit analysis seeks to determine

whether the respondent received something at a price below that available in the marketplace.

*See* Def.'s Br. 22 ("A benefit analysis, on the other hand, seeks to determine whether the

respondent received something on terms more favorable than those available on the market.").

"Commerce measures the adequacy of remuneration by comparing the price paid by a particular

respondent to an adjusted benchmark figure representative of the market price for the good at

issue."   *Essar Steel Ltd. v. United States*, 34 CIT __, __, 721 F. Supp. 2d 1285, 1292 (2010)

(citing 19 U.S.C. § 1677(5)(E)).   Thus, both the statute and case law require that a financial

contribution be made by an authority, but they do not require Commerce to inquire about the

amount of the contribution, only that it was made and that a benefit was received thereby.   It is the

amount of the benefit that must then be determined, not the amount of the contribution.   This is

precisely what the Department did here, adhering to its ordinary methodology by measuring the

price paid by BTIC and Tianjin Tianhai for the steel tube to the constructed benchmark price for

the input.

The court further finds plaintiff's contention that Commerce should have analyzed the

transactions in question under the "upstream subsidy" provision of 19 C.F.R. § 351.523 or under

19 C.F.R. § 351.525 to be without merit.   Pursuant to 19 U.S.C. § 1677-1(a), an "upstream

subsidy" is defined, in relevant part, as "any countervailable subsidy . . . that . . . is paid or

bestowed by an authority . . . with respect to a product . . . that is used in the same country as the

authority in the manufacture or production of merchandise which is the subject of a countervailing

duty proceeding."   In other words, an upstream subsidy analysis is concerned with a subsidy

received from an authority by the producer of an input when that input is used in the production of

subject merchandise, rather than a subsidy received by a third-party from an authority that

produced the input.   *See, e.g.*, Live Swine From Canada, 59 Fed. Reg. 12,243, 12,255 (Dep't of

Commerce Mar. 16, 1994) (final results of countervailing duty administrative review) (citing 19

U.S.C. § 1677-1(a)).   Because, here, the Affiliated Producer was the authority, the input producer,

and the entity conferring the subsidy in question, and was not the recipient of a subsidy from an

authority, an upstream subsidy analysis was not required.   Rather, the Department lawfully

constructed a different methodology to examine the transactions in question.   *See Guangdong*, 37

CIT at __, 900 F. Supp. 2d at 1380.

As to plaintiff's argument that Commerce should have analyzed the sales and purchases as

"affiliated transactions" under 19 C.F.R. § 351.525,[19] this provision clearly applies only to

situations where there is cross-ownership between an input supplier and a downstream producer.

Here, the Department specifically found no cross-ownership between the Affiliated Producer and

BTIC (and Tianjin Tianhai).   That is, although BTIC and Tianjin Tianhai are affiliated with the

---

[19]      Pursuant to the regulation,

  [i]f there is cross-ownership between an input supplier and a downstream
  producer, and production of the input product is primarily dedicated to production
  of the downstream product, the Secretary [of Commerce] will attribute subsidies
  received by the input producer to the combined sales of the input and downstream
  products produced by both corporations (excluding the sales between the two
  corporations).

19 C.F.R. §  351.525(b)(6)(iv).   The regulation further describes cross-ownership to be present
  between two or more corporations where one corporation can use or direct the
  individual assets of the other corporation(s) in essentially the same ways it can use
  its own assets.   Normally, this standard will be met where there is a majority
  voting ownership interest between two corporations or through common ownership
  of two (or more) corporations.

*Id.* §  351.525(b)(6)(vi).

Affiliated Producer, they are not cross-owned.[20]   Indeed, BTIC reported in its initial

questionnaire response that it shared no cross-ownership with the Affiliated Producer.   *See* Letter

from Francis J. Sailer, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, Counsel for

BTIC, to Hon. Rebecca M. Blank, Acting Secretary of Commerce, Import Administration, U.S.

Department of Commerce at 9, CD 19 at bar code 3027967-01 (Sept. 2, 2011), ECF Dkt. No. 18

("BTIC and Tianjin Tianhai purchased [steel tube] during the POI that was produced by [the

Affiliated Producer].   However, these products were sold by [a company owned by the Affiliated

Producer] to three unaffiliated intermediate, third-party trading companies which then resold the

materials to BTIC and Tianjin Tianhai.   Based on these facts, the [Affiliated Producer is] not

cross-owned with the BTIC companies for two reasons.   First, . . . BTIC [and Tianjin Tianhai's]

purchases of [steel tube] produced by the [Affiliated Producer] were purchased from an

unaffiliated third party.   Thus, the [Affiliated Producer is] not the input supplier to BTIC [and

---

[20]        As is made clear by the statute and Commerce's regulations, entities may share an
affiliate relationship absent cross-ownership between them.   *Compare* 19 U.S.C. § 1677(33), *with*
19 C.F.R. § 351.525(b)(6)(vi).   Specifically, the statute provides, in relevant part, as follows:
          The following persons shall be considered to be "affiliated" or "affiliated
persons":
                    (A) Members of a family, including brothers and sisters (whether by the
          whole or half blood), spouse, ancestors, and lineal descendants.
                    (B) Any officer or director of an organization and such organization.
                    (C) Partners.
                    (D) Employer and employee.
                    (E) Any person directly or indirectly owning, controlling, or holding
          with power to vote, 5 percent or more of the outstanding voting stock or
          shares of any organization and such organization.
                    (F) Two or more persons directly or indirectly controlling, controlled by,
          or under common control with, any person.
                    (G) Any person who controls any other person and such other person.
          For purposes of this paragraph, a person shall be considered to control another
          person if the person is legally or operationally in a position to exercise restraint or
          direction over the other person.
19 U.S.C. § 1677(33).

Tianjin Tianhai].").   Thus, the transactions are not "affiliated transactions" within the meaning of the regulation.

Accordingly, the court holds that Commerce's construction of the statute—that the financial contribution and benefit need not be conferred on the same person—is in accordance with law.   In addition, the court holds that Commerce's determination—that BTIC's and Tianjin Tianhai's purchases of the Affiliated Producer's steel tube from their third-party trading company suppliers were countervailable—is in accordance with law and supported by substantial evidence.


III.   **SELECTION OF A BENCHMARK PRICE FOR STEEL TUBE**

   **A.  The Department's Averaging Methodology Was in Accordance with Law**

As previously noted, in the Preliminary Determination, Commerce found, based on information supplied by the PRC government, that 38 percent of steel tube production in the PRC during the POI was manufactured by government-owned entities.   Preliminary Determination, 76 Fed. Reg. at 64,305.   As a result, it "determine[d] that this level of government ownership [was] substantial.   Combining this with the fact that imports as a share of domestic consumption [were] insignificant, [the Department] determine[d] that domestic prices in the PRC for [steel tube were] distorted such that they [could not] be used as a tier one benchmark."   Issues & Dec. Mem. at V.F. Thus, it instead relied on world market prices available to purchasers in the PRC (i.e., a tier-two benchmark) to construct a benchmark price for the steel tube.   *See* Preliminary Determination, 76 Fed. Reg. at 64,305.   Specifically, it selected prices reported in *SteelOrbis* for exports of steel tube in Italy—which were placed on the record by defendant-intervenor—and then averaged them to obtain a benchmark price, to which it added, among other things, inland freight charges, the value of the import duties reported by the PRC government, and the VAT applicable to imports of steel

tube into the PRC.   *See* Preliminary Determination, 76 Fed. Reg. at 64,305.   The Department

compared this benchmark to BTIC's and Tianjin Tianhai's actual purchase prices, and determined

preliminarily that the steel tube "was provided for [less than adequate remuneration] and that a

subsidy exist[ed] in the amount of the difference between the benchmark and what BTIC [and

Tianjin Tianhai] paid."   *See* Preliminary Determination, 76 Fed. Reg. at 64,305 (citing 19 C.F.R.

§ 351.511(a)).

Following publication of the Preliminary Determination, BTIC submitted additional prices

that it argued should be used to calculate the benchmark, including price data from Iran, and

diameter-specific prices of steel tube from Ukraine for ranges of 57–159 millimeters and 168–325

millimeters, which matched the diameters of the steel tube that BTIC claimed to have actually

purchased.   *See* Letter from Francis J. Sailer, Grunfeld, Desiderio, Lebowitz, Silverman &

Klestadt LLP, Counsel for BTIC, to Hon. John E. Bryson, Secretary of Commerce, Import

Administration, U.S. Department of Commerce, CD 63 at bar code 3043993-01 (Nov. 30, 2011),

ECF Dkt. No. 18 ("BTIC Proposed Benchmark Info").   With respect to calculating a benchmark

price for steel tube in its Final Determination, Commerce departed from its Preliminary

Determination by averaging the prices from all three sources (Italy, Iran, and Ukraine) of price

data on the record, and used that average as a benchmark.   *See* Issues & Dec. Mem. at cmt. 8.

Plaintiff asserts that the Department committed two errors when it chose to average the

available steel tube prices from all three countries, rather than selecting the Ukrainian prices.   *See*

Pl.'s Br. 30–33.   First, it contends that the Ukrainian steel tube prices were the best information on

the record and should have been the sole source selected to calculate the benchmark because they

were the only record prices that identified the diameter of the steel tube being used, and those

prices matched the diameter range of the steel tube actually purchased by BTIC and Tianjin

Tianhai.   *See* Pl.'s Br. 31–32.   BTIC argues that the record demonstrates that there is a significant

price variation based on diameter.   *See* Pl.'s Br. 33.   In doing so, it maintains that the 57–159

millimeters "category from the Ukraine is consistently lower each month during the POI than the

168–325 [millimeter Ukraine] category" and also "consistently lower than the [combined prices]

from other countries containing all [steel tube] diameter levels."   Pl.'s Br. 33 (citing Mem. from

Christopher Siepmann, International Trade Compliance Analyst, AD/CVD Operations, for Susan

Kuhbach, Office Director, AD/CVD Operations at Attach. 3, CD 96 at bar code 3073976-01 (Apr.

30, 2012), ECF Dkt. No. 18 ("Final Calculation Mem.")).

Second, plaintiff makes the related argument that the Department was not required to use

the average of all record benchmark prices for the entire POI and that instead, it should have

selected the lowest record price for each month if it was not going to rely upon the Ukrainian prices

exclusively.   Pl.'s Br. 35, 37 ("Selecting the lowest market price from any country is the only way

to determine whether BTIC and Tianjin Tianhai had purchased [steel tube] at [less than adequate

remuneration].   If the Department selected only a single country from the record for all months

and there were lower prices in another country for a particular month, then the Department would

be unreasonably inflating the benefit BTIC received in that month.   Or, more simply, the

Department would be calculating a benefit when a lower world market price on the record would

result in no benefit at all.").   BTIC argues that "the primary goal in determining the most

appropriate benchmark is to identify a benchmark that would actually be available to purchasers

in" the PRC.   Pl.'s Br. 35.   Thus, for BTIC, "when prices from multiple countries are averaged

together, across country lines, the resulting *constructed* price is *not* one that BTIC and Tianjin

Tianhai could have actually obtained.   Instead, this cross-country average represents a purely

hypothetical constructed price that is *not* obtainable from any single source."   Pl.'s Br. 36

(citations omitted).   Thus, BTIC contends that Commerce's employed methodology ran afoul of 19 C.F.R. § 351.511.   This is because, for BTIC, the regulation only requires Commerce to average record benchmark prices "to the extent practicable" where each of those prices would be available to a respondent.   *See* Pl.'s Br. 35 (quoting 19 C.F.R. § 351.511(a)(2)(ii)) (internal quotation marks omitted).

Having taken plaintiff's arguments into consideration, the court holds that the Department acted lawfully in averaging the prices available on the record from Ukraine, Italy, and Iran to calculate the benchmark price for steel tube.

As previously discussed, under the countervailing duty statute, "[a] benefit shall normally be treated as conferred" by the Department "where goods or services are provided, if such goods or services are provided for less than adequate remuneration."   19 U.S.C. § 1677(5)(E)(iv). Further, when using a tier-two benchmark, Commerce's regulations require that, "[w]here there is more than one commercially available world market price, the Secretary [of Commerce] will average such prices to the extent practicable, making due allowance for factors affecting comparability."   19 C.F.R. § 351.511(a)(2)(ii).

In this case, Commerce's selection of a tier-two benchmark is not in dispute.   Thus, the issue is whether Commerce erred by averaging the prices available from three countries to calculate a benchmark price for steel tube, rather than relying solely on the Ukrainian data, which was, according to BTIC, specific to the steel tube purchased by it and Tianjin Tianhai.   First, Commerce's calculation of an average of the Italian, Ukrainian, and Iranian prices is consistent with its regulation, which states that, when using a tier-two benchmark that involves "more than one commercially available world market price," the Department "*will* average such prices to the extent practicable."   19 C.F.R. § 351.511(a)(2)(ii) (emphasis added).   The Department evaluated

the Ukraine and Iranian price data offered by BTIC, and, like the Italian price data originally

submitted by defendant-intervenor, found these prices "to be FOB export prices and, therefore,

sufficiently reliable and representative."   Issues & Dec. Mem. at cmt. 8.   In addition,

Commerce's averaging of multiple data sets, when available, to obtain a world market price is

consistent with not only its regulation but its past practice.   *See, e.g.*, Galvanized Steel Wire From

the PRC, 77 Fed. Reg. 17,418 (Dep't of Commerce Mar. 26, 2012) (final affirmative

countervailing duty determination), and accompanying Issues and Decision Memorandum at

comment 8 ("Galvanized Steel Wire Issues & Dec. Mem."); Certain Seamless Carbon and Alloy

Steel Standard, Line, and Pressure Pipe from the PRC, 75 Fed. Reg. 57,444 (Dep't of Commerce

Sept. 21, 2010) (final affirmative countervailing duty determination, final affirmative critical

circumstances determination), and accompanying Issues and Decision Memorandum at comment

9.

Next, although Commerce must use benchmark prices for merchandise that is *comparable*

to a respondent's purchases to satisfy the regulation, there is nothing that requires that it use prices

for merchandise that are *identical* to a respondent's purchases.   *See Archer Daniels Midland Co.

v. United States*, 38 CIT __, __, 968 F. Supp. 2d 1269, 1278 (2014) ("Commerce . . . is required

only to select benchmarks that are comparable, not identical." (citing 19 C.F.R. §

351.511(a)(2)(ii)).   Even if the Department were required to use prices for identical merchandise,

the record does not support plaintiff's claim that BTIC's and Tianjin Tianhai's purchases of steel

tube were limited to the diameter ranges provided for in the Ukrainian data.   The Ukrainian data

supplied prices for steel tube with diameter ranges of 57–159 millimeters and 168–325

millimeters.   Invoices placed on the record of BTIC's and Tianjin Tianhai's steel tube purchases,

however, demonstrate that they made purchases outside the diameter ranges listed in the Ukrainian

data.   *See* BTIC Proposed Benchmark Info at Ex. 2.   As a result, the Ukrainian data cannot be

said to be more specific than other record prices.   Indeed, as plaintiff points out, the Iranian and

Italian prices include all steel tube diameter levels.   *See* Pl.'s Br. 33.   This being the case, these

prices cover all of the diameters purchased by plaintiff.   Thus, based on the record, not only is the

Ukrainian data not specific to BTIC's and Tianjin Tianhai's purchases of steel tube, but because

the Italian and Iranian data contain prices for all diameters, these prices are arguably more

representative.   Plaintiff's arguments are therefore unconvincing.

Moreover, despite plaintiff's claims to the contrary, as the Department has explained

previously, "[t]here is no basis in the regulations for selecting . . . the lowest monthly world market

price in identifying the monthly benchmark . . ." as plaintiff would have the court hold.

Galvanized Steel Wire Issues & Dec. Mem. at cmt. 8.   Commerce's regulation unambiguously

directs it to average multiple prices available on the record to determine a world market price as

the benchmark.   *See* 19 C.F.R. § 351.511(a)(2)(ii) ("Where there is more than one commercially

available world market price, the Secretary [of Commerce] *will average* such prices to the extent

practicable, making due allowance for factors affecting comparability." (emphasis added)).

Commerce followed its regulation and averaged the three data sets on the record, which it had

found to be sufficiently reliable and representative.   *See Essar Steel*, 34 CIT at __, 721 F. Supp. 2d

at 1293 ("When using a tier two benchmark, Commerce must average all commercially available

world market prices to arrive at the benchmark figure." (citing 19 C.F.R. § 351.511(a)(2)(ii))).

Although plaintiff maintains that it would have necessarily obtained the lowest price for

steel tube available each month, there is nothing on the record to suggest that this is actually the

case.   Indeed, that the data from Italy and Iran includes prices for the same diameter of steel tube

contained in the Ukraine data, yet the steel tube is being offered for sale, and presumably sold, at

different amounts, demonstrates that there are other considerations, in addition to price, that affect

the price of steel tube.   That is, such factors as quality, delivery time, current availability,

reliability of supply, supplier qualification, and product consistency enter into purchasing

decisions.   *See, e.g.*, *Nippon Steel Corp. v. United States*, 28 CIT 1738, 1761, 350 F. Supp. 2d

1186, 1206 (2004) (citations omitted), *rev'd on other grounds*, 458 F.3d 1345 (Fed. Cir. 2006);

*Comm. for Fair Coke Trade v. United States*, 27 CIT 774, 790 n.18 (2003) (citation omitted);

*Kern-Liebers USA, Inc. v. United States*, 19 CIT 87, 102 (1995) (citations omitted).   Therefore,

contrary to plaintiff's assertions, purchasing decisions are based on a number of considerations,

and are not limited to a product's price, and plaintiff's argument, that only the lowest prices should

be used in constructing the benchmark, is unconvincing.

Finally, plaintiff's claim, that averaging the three data sets was impracticable, is also

unconvincing.   As the Department noted, there was no difficulty to calculating an average of

these three prices, which is precisely why it proceeded as it did in the Final Determination by doing

so.   *See* Issues & Dec. Mem. at cmt. 8.

Accordingly, the court holds that Commerce's construction of a benchmark price for steel

tube was supported by substantial evidence and was in accordance with law.


### B.  Exhaustion of Administrative Remedies

In addition to its objections to the methodology used by Commerce to select a benchmark

price for steel tube as discussed above, plaintiff asserts that, if 19 C.F.R. § 351.511(a)(2)(ii)

permits averaging of this type, the regulation is contrary to its statute.   Pl.'s Br. 37.   BTIC makes

this claim before the court, despite not presenting its argument in its case brief to Commerce.

Pursuant to 19 U.S.C. § 1677(5)(E), the adequacy of remuneration must "be determined in relation

to prevailing market conditions for the good or service being provided or the goods being

purchased in the country which is subject to the investigation."   For plaintiff, the regulation's

averaging goes beyond the statutory grant directing that, "[w]here there is more than one

commercially available world market price, the Secretary [of Commerce] will average such prices

to the extent practicable . . . ."   *See* 19 C.F.R. § 351.511(a)(2)(ii); Pl.'s Br. 39.   This averaged

price, plaintiff claims, is impermissible for two reasons.   First, the price is hypothetical and

cannot actually be obtained by a respondent.   Pl.'s Br. 40.   Second, because the price being

selected is to be used to calculate the unfair benefit provided to a respondent, the methodology

should use the lowest acceptable market price on the record.   *See* Pl.'s Br. 40.

Defendant, however, observes that BTIC failed to exhaust its administrative remedies with

respect to this argument, because it never raised the argument before Commerce in its case brief

during the investigation.   Def.'s Br. 37.   Nonetheless, plaintiff urges the court to consider its

challenge to the validity of 19 C.F.R. § 351.511(a)(2)(ii), arguing that it would have been futile for

it to have presented this claim to the Department and that it is therefore excused from having failed

to do so.   *See* Pl.'s Reply Br. 16–17 (ECF Dkt. No. 45).

Because the futility exception is inapplicable here, the court will not consider plaintiff's

argument regarding the validity of the regulation, which it makes here for the first time.   A court

"shall, where appropriate, require the exhaustion of administrative remedies."   28 U.S.C. §

2637(d); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir.

2013).   "To exhaust its administrative remedies, a party usually must submit a case brief

'present[ing] all arguments that continue in [its] view to be relevant to [Commerce's] final

determination or final results.'"   *Qingdao Taifa Grp. Co. v. United States*, 33 CIT 1090, 1092–93,

637 F. Supp. 2d 1231, 1236 (2009) (alterations in original) (quoting 19 C.F.R. § 351.309(c)(2))

(citing *Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 553, 564, 558 F. Supp. 2d 1319, 1329 (2008)).   There are several well-settled exceptions to the requirement of exhaustion, including "[t]he futility exception[, which] applies where a party 'would be required to go through obviously useless motions in order to preserve their rights.'"   *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38 CIT __, __, 968 F. Supp. 2d 1255, 1266 (2014) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)).   This "exception, however, is a narrow one."   *Corus Staal*, 502 F.3d at 1379.   It has been granted, for example, in a "rare" circumstance, such as where "Commerce's position, which [it] was defending in court at the time, was that it had no discretion in that matter because it was constrained by statute to reject [the plaintiff's] position."   *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1148 (Fed. Cir. 2013).   Case law is clear, though, that "[t]he mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies." *Corus Staal*, 502 F.3d at 1379 (citing *Commc'ns Workers of Am. v. Am. Tel. & Tel. Co.*, 40 F.3d 426, 432–33 (D.C. Cir. 1994)).   Thus, "futility can excuse a party from additional practice before the agency [only] when it has already fully presented its arguments to the Department in some form and had those arguments rejected, but not where it declines to present the arguments at all because it believes the agency will be unlikely to accept them."   *Xinjiamei*, 38 CIT at __, 968 F. Supp. 2d at 1266.

This case, however, is not a situation where it would have served no purpose for plaintiff to make its argument before Commerce.   Whether the Department was unlikely to accept BTIC's position does not excuse its failure to present the argument to Commerce.   *See id.*   Doing so would have afforded Commerce the opportunity to respond to plaintiff's arguments and justify its interpretation of its regulation and the underlying statute, which in turn, would have created a

record for the court to review on appeal.   Because making its argument would not have been a

"useless motion," the futility exception is unavailable to plaintiff.[21]   *See Xinjiamei*, 38 CIT at __,

968 F. Supp. 2d at 1267.

### C.  The Department's Addition of the VAT, Import Duties, and Inland Freight Costs Was in Accordance with Law

In the preliminary and final determinations, Commerce used world market prices available

to purchasers in the PRC as a benchmark for steel tube.   *See* Preliminary Determination, 76 Fed.

Reg. at 64,305; Issues & Dec. Mem. at V.F.   The Department adjusted this benchmark price for

steel tube to include, among other things, delivery charges, such as inland freight.   *See* Final

Calculation Mem. at 59, 64.   Commerce also added to the benchmark price the VAT applicable to

imports of steel tube into the PRC and the value of the import duties reported by the PRC

government.   Preliminary Determination, 76 Fed. Reg. at 64,305; Issues & Dec. Mem. at V.F.

---

[21]       Plaintiff, in its reply brief, argues only that the futility exception to the exhaustion doctrine is applicable here, and omits any claim that, for instance, the "pure question of law" exception is available.   *See* Pl.'s Reply Br. 16–17.   Despite plaintiff's failure to raise this claim, the court notes that it is unlikely that it would have succeeded if it had.   The pure question of law exception is applicable only "for a clear statutory mandate that does not implicate Commerce's interpretation of the statute under the second step of *Chevron*."   *Fuwei Films (Shandong) Co. v. United States*, 35 CIT__, __, 791 F. Supp. 2d 1381, 1384 (2011) (citing *Agro Dutch Indus. v. United States*, 508 F.3d 1024, 1032 (Fed. Cir. 2007)).   Where, as here, however, the statute does not speak to the precise question of requiring the averaging of prices in all instances, the court must look to Commerce's construction of the statute, which fills the statutory gap, to determine whether its interpretation is reasonable.   *See Chevron*, 467 U.S. at 843.   As previously explained by this Court, a *Chevron* step-two issue cannot on its own be resolved by the court because "it requires the input of Commerce.   To address the problem, the court would first have to remand the issue to Commerce, an inefficiency occasioned solely by [p]laintiff's inaction."   *Fuwei Films*, 35 CIT at __, 791 F. Supp. 2d at 1385.   Consequently, "[t]he pure question of law exception . . . cannot apply in this instance because its application would undermine the very purposes the exhaustion requirement is designed to promote."   *Id.*

BTIC objects to the addition of the VAT and import duties to the benchmark prices.   *See* Pl.'s Br. 40.   According to plaintiff, the record establishes that BTIC and Tianjin Tianhai would not pay the VAT or import duties if they imported steel tube.   Pl.'s Br. 43.   Plaintiff claims that Tianjin Tianhai provided evidence during verification that it was not required to pay the tax and duties, because of its location in a free-trade zone, so long as the imported steel tube was used for the manufacture of subject merchandise intended for export.   Pl.'s Br. 44.   In addition, plaintiff argues that "Chinese 'processing' law would permit [BTIC and Tianjin Tianhai] to avoid the payment of VAT and import duties on [raw materials] so long as the final product is for export," and as a result, "the delivered price that BTIC and Tianjin Tianhai *would* pay if they imported [steel tube] would not include VAT or import duties."   *See* Pl.'s Br. 41, 43 (citation omitted).

Plaintiff further contends that "[t]he Department's conclusion that BTIC's and Tianjin Tianhai's individual import experience is irrelevant to the benchmark calculation is contrary to the plain language of the regulation and unsupported by substantial evidence."   Pl.'s Br. 41.   The language of the regulation requires the use of the "delivered" price, and, for plaintiff, this means that the addition of the VAT to the benchmark price for the steel tube is contrary to law.   *See* Pl.'s Br. 42 (citing 19 U.S.C. § 1677(5)(E)(iv); 19 CFR § 351.511(a)(2)(iv)).   Plaintiff's position is that the regulation and statute direct Commerce to make a case-specific determination as to whether the VAT and import duties would be added and then include, or not include, the value of the VAT and import duties accordingly.   *See* Pl.'s Br. 43.   Thus, for plaintiff, where a respondent would not pay the VAT or import duties, those costs should not be added by the Department.

Also, plaintiff objects, as inconsistent, Commerce's inclusion of the costs that BTIC and Tianjin Tianhai actually incurred for the delivery of steel tube in the construction of the benchmark price for each company.   BTIC claims that "[t]he Department's use of a company-specific

adjustment for one component of the benchmark price [(i.e., inland freight charges)] while

refusing to do the same for other components of the benchmark price [(i.e., VAT and import

duties)] is arbitrary, capricious and otherwise contrary to law."   Pl.'s Letter Br. Regarding Inland

Freight 1–2 (ECF Dkt. No. 66).   In other words, for plaintiff, it is inconsistent for Commerce to

use BTIC's and Tianjin Tianhai's actual experience in constructing one part of the benchmark but

ignore it when constructing another part.

The court is unpersuaded by plaintiff's claims.   Commerce's regulations direct it to use

"delivered prices" when calculating a benchmark price.   *See* 19 C.F.R. § 351.511(a)(2)(iv).

These delivered prices are calculated differently when a tier-two benchmark is used rather than a

tier-one benchmark.   A tier-one benchmark uses an actual transaction price[22] for the good in

question to measure the adequacy of remuneration.   *See Essar Steel Ltd. v. United States*, 678

F.3d 1268, 1273 (Fed. Cir. 2012) (citing 19 C.F.R. § 351.511(a)(2)(i)).   A tier-two benchmark, on

the other hand, seeks to construct a world market price.   *Id.* (citing 19 C.F.R. § 351.511(a)(2)(ii)).

Thus, a tier-one analysis looks at a market-determined price for the good resulting from actual

transactions in the country in question, while a tier-two analysis seeks to determine a price that

would reasonably be available to purchasers in that country.

The statute requires that "the adequacy of remuneration shall be determined in relation to

prevailing market conditions for the good or service being provided or the goods being purchased

in the country which is subject to the investigation or review."   19 U.S.C. § 1677(5)(E).   Such

"[p]revailing market conditions include price, quality, availability, marketability, *transportation*,

and other conditions of purchase or sale."   *Id.* (emphasis added).

---

[22]      While the Department often uses the actual transaction prices for the respondents in
an administrative proceeding, this opinion should not be read as finding that it must do so.

Pursuant to 19 C.F.R. § 351.511(a)(2)(iv), the Department is directed to adjust the

benchmark prices by "includ[ing] delivery charges and import duties."   In addition, the regulation

directs Commerce to measure "the price that *a firm* actually paid or would pay if it imported the

product."   19 C.F.R. § 351.511(a)(2)(iv) (emphasis added).   When constructing a tier-two

benchmark, the reference to "a firm" does not mean the respondent.   Rather, it refers to a

hypothetical firm located in the PRC purchasing steel tube during the POI.   This is why the

Department is directed, when calculating tier-two benchmarks, to determine "price[s that] would

be available to purchasers in the country in question."   19 C.F.R. § 351.511(a)(2)(ii).   Thus, that

(1) Tianjin Tianhai, specifically, might not pay the VAT or import duties on steel tube because the

company was located in a free-trade zone, and that, (2) under PRC law, neither Tianjin Tianhai nor

BTIC would pay taxes and duties on their purchases of steel tube that were intended to be used in

the manufacture of a final product intended for export, is irrelevant, given that *a firm* located in the

PRC that imported steel tube would ordinarily have paid these duties.[23]

Indeed, the Federal Circuit has upheld the Department's practice of ignoring a particular

respondent's conditions of purchase when calculating tier-two benchmark prices, and found that

---

[23]      As defendant correctly notes, plaintiff's reliance on *Certain New Pneumatic Off-the-Road Tires* is inapposite, because, there, Commerce used tier-one prices (i.e., "market prices from actual transactions within the country under investigation") in its determination to calculate the benchmark, rather than tier-two prices (i.e., "world market prices that would be available to purchasers in the country under investigation") as it did here.   *See* Certain New Pneumatic Off-the-Road Tires From the PRC, 73 Fed. Reg. 40,480 (Dep't of Commerce July 15, 2008) (final affirmative countervailing duty determination and final negative determination of critical circumstances), and accompanying Issues and Decision Memorandum at IV.A.1, cmt. D.6 ("Certain New Pneumatic Off-the-Road Tires Issues & Dec. Mem.") (citing 19 C.F.R. § 351.511(a)(2)(i), (ii)).   That is, in *Certain New Pneumatic Off-the-Road Tires*, the respondents did not pay the VAT or import duties, and thus, Commerce did not add these amounts to the benchmark price because, rather than seek to determine the world market price that "would be available to purchasers in the country in question," as it did here, it instead used the actual experience of the respondents being reviewed.   *See* Certain New Pneumatic Off-the-Road Tires Issues & Dec. Mem. at cmt. D.6; 19 C.F.R. § 351.511(a)(2)(ii).

adding these charges to a benchmark price, even where the respondent did not incur these costs, "is consistent with the relevant statute and regulation." *Essar Steel*, 678 F.3d at 1274 ("Both the statute and the regulation, however, *require* that these costs [(freight and import costs)] be added to the benchmark prices.   Commerce's decision to add these charges to the benchmark prices is consistent with the relevant statute and regulation and is supported by substantial evidence." (citing 19 U.S.C. § 1677(5)(E); 19 C.F.R. § 351.511(a)(2)(iv))).

Plaintiff does not dispute that other firms would pay these costs.   Indeed, "[t]he importation of products necessarily entails payment of certain 'delivery charges and import duties' that would not apply when procured domestically." *Essar Steel*, 34 CIT at __, 721 F. Supp. 2d at 1294 (quoting 19 C.F.R. § 351.511(a)(2)(iv)).   The Department properly observed its regulations and adjusted the benchmark price for steel tube to account for the VAT and import duties that firms located in the PRC, which purchased steel tube, would ordinarily have paid.

Further, contrary to plaintiff's assertions, the Department acted consistently when adjusting the benchmark prices to include delivery charges.   *See, e.g.*, Aluminum Extrusions From the PRC, 76 Fed. Reg. 18,521 (Dep't of Commerce Apr. 4, 2011) (final affirmative countervailing duty determination), and accompanying Issues and Decision Memorandum at comment 20 (citing 19 C.F.R. § 351.511(a)(2)(iv)).

Although plaintiff claims that Commerce's inclusion of inland freight charges that were specific to BTIC's and Tianjin Tianhai's purchases of steel tube was at odds with the Department's refusal to use company-specific information for other components of the benchmark price (e.g., VAT and import duties), there is no inconsistency.   This is the case even though Commerce did, in fact, determine the amount of inland freight costs using numbers based on BTIC's and Tianjin Tianhai's actual experience.   *See* Final Calculation Mem. at 59, 64.   Here, however, BTIC's and

Tianjin Tianhai's numbers were the only sets of inland freight data placed on the administrative record.   Thus, despite its practice of ordinarily declining to rely upon delivery charge data that is specific to a particular respondent when using a tier-two benchmark, because, here, there was no other data available on the record, the Department was left with only the actual price data reported by BTIC and Tianjin Tianhai to calculate the benchmark for steel tube.   "The burden of building the administrative record lies with the interested parties."   *Jacobi Carbons AB v. United States*, 38 CIT__, __, 992 F. Supp. 2d 1360, 1369 (2014) (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).   Had plaintiff wished to place other evidence of freight costs on the record, it could have done so.   Consequently, Commerce's selection of BTIC's and Tianjin Tianhai's inland freight data was reasonable and was not irreconcilable with its decision to decline to make company-specific adjustments for other components of the benchmark price for steel tube.

## CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the Department of Commerce's Final Determination is sustained.

Judgment will be entered accordingly.

Dated:            February 6, 2015
                     New York, New York


                                                          _____/s/ Richard K. Eaton_____
                                                                        Richard K. Eaton